IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2019 Session

**SAMUEL GREGORY DORSEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-829      Angelita Blackshear Dalton, Judge**

_____

**No. M2018-01610-CCA-R3-PC**

_____

The Petitioner, Samuel Gregory Dorsey, filed a post-conviction petition seeking relief from his conviction of attempted aggravated sexual battery, alleging that his trial counsel was ineffective and that his guilty plea was not knowingly and voluntarily entered. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Daniel J. Murphy, Nashville, Tennessee, for the Appellant, Samuel Gregory Dorsey.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On May 27, 2016, the Petitioner was indicted for the aggravated sexual battery of the victim, who was less than thirteen years old. The offense occurred sometime between October 11, 2004, and October 10, 2005. On April 26, 2017, the Petitioner pled guilty to attempted aggravated sexual battery. Pursuant to the plea agreement, the Petitioner received an out-of-range sentence of seven years as a career offender, sixty percent of which he was required to serve in confinement. The sentence was ordered to be served

concurrently with a prior sentence for which the Petitioner was on parole. Additionally, he was required to have community supervision for life and was placed on the sexual offender registry.

At the guilty plea hearing, the trial court advised the Petitioner of the terms of the plea agreement, and the Petitioner agreed to the terms. The trial court advised the Petitioner that his guilty plea must be voluntary, that he did not have to enter a guilty plea, and that he had a right to a jury trial. The trial court asked if the Petitioner had reviewed the plea agreement with his trial counsel, if he understood what he was doing, and if he were pleading guilty voluntarily. The Petitioner responded affirmatively to the trial court's questions.

The State recited the following factual basis for the Petitioner's guilty plea:

> The State's proof would have shown that on October 11, 2014 the victim in this case initials A.M., date of birth October 11, 1998 disclosed to her youth pastor that she had been sexually abused by her mother's boyfriend who had been [the Petitioner] when she was six-year[s]-old. . . . The victim disclosed three specific incidents to her youth pastor. On November 19, 2014 the victim was forensically interviewed at the Nashville Children's Alliance. The victim stated that the first time the [Petitioner] abused her was when the [Petitioner] told the victim they were going to the [Petitioner's] daughter's birthday party.
>
> The [Petitioner] drove the victim to his house in Davidson County and made the victim get on her hands and knees. The [Petitioner] asked the victim what did she want. The victim became uncomfortable during this interview and began writing out her responses instead of verbally responding to the questions.
>
> The victim disclosed during the forensic interview that the [Petitioner] began touching the victim's thigh and then eventually touched the victim's lady parts which she referred to as NoNo. The victim circled the vaginal area on an anatomical drawing as the area she referred to as lady parts and the NoNo area.

- 2 -

The victim stated that the [Petitioner] only touched on the outside of her vaginal area and never on the inside. The victim then stated two other incidents occurred at her house, but she doesn't recall being touched, just remembers putting her clothes back on.

A year later Detective Casey Stupka finally interviewed the [Petitioner] at the Hardeman County Correctional Facility. The [Petitioner] made no admissions but had already been made aware of the allegations by DCS a year prior.

Subsequently, the Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective and that his guilty plea was not knowingly and voluntarily entered. At the post-conviction hearing, the Petitioner testified that although he pled guilty, "I didn't do nothing. . . . I never touched her ever in my life." The Petitioner did not recall telling the trial court that his guilty plea was knowing and voluntary and asserted that it was not voluntary.

The Petitioner said that trial counsel did not help him "at all." He said no one explained to him the problems with the State's evidence or the anticipated defense. The Petitioner asked trial counsel to file a motion for a bill of particulars, but trial counsel did not file the motion. The Petitioner also asked trial counsel to interview the victim, the victim's mother, and the victim's grandmother, but trial counsel did not interview the witnesses. The Petitioner never spoke with an investigator.

The Petitioner acknowledged that trial counsel provided him with a copy of the State's discovery, and he said that he "noticed a lot of problems" in the discovery. First, he thought the discovery was supposed to include "CDs of the victim's statement," but they were not included. Next, he recalled that a police detective had told him that the victim had identified him, which the Appellant said was impossible because he had not committed the crime. Also, on a photograph lineup included in discovery, the victim's mother, not the victim, appeared to have identified the Petitioner. The Petitioner said that trial counsel also noticed that the victim's mother was the person who identified the Petitioner. The Petitioner opined that the victim's mother identified him because "she couldn't stand me at all," noting that the victim's mother had told him she was pregnant, and he responded, "[N]o, that can't be and [he] walked out on her and . . . never saw her again."

The Petitioner said that the discovery contained numerous police reports the victim's mother filed against him prior to October 2005. The Petitioner contended that if

he had been stealing from the victim's mother, she would not have trusted him to watch the victim alone. The Petitioner said that he was never alone with the victim, that he never touched her, and that he saw her on only three occasions, two of which were in public places. The Petitioner asked trial counsel to contact the victim's grandmother to determine who was responsible for caring for the victim when her mother was at work or school, but trial counsel did not comply.

When the Petitioner questioned trial counsel about his case, trial counsel responded that he had many other cases, which made the Petitioner think he was "going down." The Petitioner acknowledged that he had been in court previously for other criminal cases. The Petitioner said that during his incarceration, the "jailhouse lawyers" told him that he should have fired trial counsel early in his representation but that it was "too late" to obtain a new attorney because it was near the time for his plea. He listened to the advice of the "jailhouse lawyers," believed he could not get a new attorney, and felt he had no choice but to plead guilty.

The Petitioner said that a couple of weeks before he pled guilty, he had a video conference with trial counsel. During the conference, trial counsel advised him that the State would agree to a six-year sentence and release eligibility after serving thirty percent of the sentence in confinement if the Petitioner pled guilty. The Petitioner agreed to accept the plea offer. The Petitioner asked trial counsel to keep him updated; however, trial counsel did not inform him until the day of the guilty plea hearing that "everything had changed." The Petitioner did not agree with the changes, and trial counsel continued to negotiate with the State.

The Petitioner acknowledged that he told the trial court that he was pleading guilty voluntarily and that he understood he had the right to a jury trial and to confront his accusers. He explained, however, that during the guilty plea hearing, he did not pay attention to what was transpiring because he "was in a zone. I was zoned out." The Petitioner said that he did not remember the trial court's advising him that his sentence would be out-of-range; however, he remembered trial counsel's telling him that the trial court would not approve an out-of-range sentence and would "throw that out."

On cross-examination, the Petitioner said that although "jailhouse lawyers" told him he could not obtain a new attorney so close to his guilty plea hearing, he did not ask trial counsel or the trial court whether he could obtain new counsel. The Petitioner acknowledged that he had entered guilty pleas on previous occasions.

The Petitioner estimated that trial counsel spent approximately twenty-six hours with him; however, he thought trial counsel "was not representing me at all. He was not looking out for my interest."

The Petitioner said that trial counsel never discussed possible defenses; he only discussed a possible plea agreement. Trial counsel told the Petitioner that he faced a sentence of eleven or twelve years at one hundred percent.

The Petitioner said that he could read and that he was given a copy of the written plea agreement. He acknowledged that the plea agreement stated he would plead guilty to attempted aggravated sexual battery and would receive a sentence of seven years with release eligibility after serving sixty percent of the sentence. He contended that the plea agreement differed from the one he had seen before he arrived at the courthouse. The Petitioner acknowledged that the trial court advised him that he had the right to a jury trial. He maintained that he did not want to plead guilty but said that he did not want to go to trial with trial counsel because they had not discussed any defenses. The Petitioner said that trial counsel did not explain the plea agreement to him but agreed he had told the trial court that trial counsel had explained the plea agreement. The Petitioner said that he did not lie to the trial court but that he "was zoned out. I didn't hear nothing . . . [b]ecause I was giving my life away for nothing."

The Petitioner said that trial counsel "was an all right guy to me, but I didn't understand what I was pleading to." He did not understand that he was receiving a sentence of seven years and that he would be required to serve sixty percent of the sentence in confinement before being eligible for release. He explained that based on the video conference he had with trial counsel, he thought he was accepting a sentence of six years at thirty percent. Trial counsel never told the Petitioner that there had been a miscommunication with the State about the sentence. The Petitioner said that he must have been "zoned out" when the trial court told him he was receiving a sentence of seven years at sixty percent.

Trial counsel testified that he began practicing law in 2011 and that he worked for the public defender's office. Trial counsel agreed that a public defender had "real hardships," such as a high caseload. In 2016, he "was scattered throughout General Sessions and Criminal Court," and it was "pretty overwhelming." Trial counsel said that his high caseload affected his representation of the Petitioner.

Trial counsel said that every case should be investigated, even when it appeared the case would be resolved by a plea agreement. Trial counsel received discovery, which included police reports the victim's mother had made against the Petitioner. He noted that the State usually did not include unrelated materials in discovery "unless there is some sort of bias or something that suggests that [the Petitioner] could be not guilty or innocent"; therefore, he thought the State "realize[d] that [it] had some credibility issues

with one of [its] witnesses." Trial counsel and the Petitioner wanted to explore the credibility issues.

Trial counsel said that he was assigned to the Petitioner's case in September 2016. Trial counsel was especially concerned about potential sentencing issues, noting that the Petitioner was serving a sentence for a similar offense. Trial counsel filled out an investigative request form, asking for one of the public defender's investigators to find and interview the victim, the victim's mother, and the victim's grandmother. Trial counsel noted that he had given the investigator contact information for the victim's mother. The Petitioner's case file did not contain any notes from an investigator, but trial counsel thought an investigator told him that he tried to locate the witnesses but was unsuccessful. Trial counsel thought the investigator's attempts may have been cursory, such as using "something like Google." Trial counsel acknowledged that he failed to follow up with the investigator as he should have.

Trial counsel stated that the public defender's office did not have a sufficient number of investigators to match their needs. Trial counsel thought the Petitioner was entitled to a good investigation, noting the "ten-year gap" between the commission of the alleged offense and the accusation. Trial counsel said that he did not have the resources to represent the Petitioner and also personally do the investigation.

Trial counsel agreed that the limited number of investigators hindered his ability to effectively represent his clients and that with a thorough investigation, he felt he "would have been in a better position." Trial counsel stated that being "short-staffed" meant "things get overlooked." He thought "in this case, you know, it was not done the way that it should have been done."

On cross-examination, trial counsel said that the State had a reputation for prosecuting "in a very strict manner." The discovery reflected that although the Petitioner had been charged with only one count, the victim had alleged three separate incidents. Trial counsel was concerned that plea negotiations might motivate the State to "supersede with other counts . . . and make it a two or three count indictment." Trial counsel was concerned about the possibility of consecutive sentencing because the Petitioner was serving a sentence for a similar offense.

Trial counsel acknowledged that the public defender's office had access to investigators, that he made an investigative request, that an investigator responded to the request, and that the "investigator did exactly what [trial counsel] asked [him] to do." Trial counsel agreed that the witnesses could have refused to speak with the investigator if he had found them.

Trial counsel explained to the Petitioner that he could have faced two additional counts of aggravated sexual battery, each of which held a potential sentence of twelve to twenty years with the possibility of consecutive sentences. Trial counsel said that he and the Petitioner spent a lot of time discussing sentencing.

Trial counsel recalled that the State made multiple plea offers and that he conveyed each offer to the Petitioner. Trial counsel thought the first offers had a sentence of at least eleven or twelve years at eighty-five or one hundred percent. At some point, the State told the Petitioner that it would not engage in further plea negotiations and that either he needed to agree to plead guilty or the case would be set for trial. At the time of the guilty plea, the case had never been set for trial. Trial counsel would have had additional time to work on the case if the Petitioner had not pled guilty.

Trial counsel said that during plea negotiations, he sent the State an e-mail with "a seven-year offer," and the State responded "saying something about a six." Trial counsel accepted the six-year offer but was confused by the State's offer of a shorter sentence. Around the same time, trial counsel had a video conference with the Petitioner and conveyed the State's six-year offer. Trial counsel did not recall the percentage he told the Petitioner he would have to serve. He thought an offer of a six-year sentence at thirty percent would have been "quite odd" in light of trial counsel's proposal of a seven-year sentence at eighty-five percent. After the video conference, the State sent trial counsel an e-mail explaining that it had meant to offer seven years but had mistakenly typed a six.

Trial counsel said that on the day of the guilty plea, he explained to the Petitioner that the actual offer was for seven years. The written plea agreement originally stated the Petitioner's sentence was to be seven years and one month at sixty percent, but the State agreed to remove the one month. Trial counsel fully explained the terms of the plea agreement to the Petitioner, and the Petitioner said he understood and did not express any concerns about the agreement.

Trial counsel said the Petitioner wrote him a letter saying that he feared trial counsel "was not fighting for him" and that he thought trial counsel would be doing more if he had been retained. The Petitioner did not say that he wanted to fire trial counsel but stated he felt that trial counsel was not doing his job. Trial counsel responded to the letter, explaining that "here is why those things don't matter, and here is what I am doing, and here is what I apologize for." The Petitioner did not express any concerns about trial counsel's performance on the day of the guilty plea hearing.

Dawn Deaner, the Chief Public Defender for Davidson County, testified that the caseload of the attorneys was "a significant concern in our office." She opined that "[a]n excessive caseload [made] it difficult if not impossible for a lawyer to do all of the things

that a lawyer needs to do for each client to render effective constitutional representation." She said that effective representation had several components, such as communication with clients about their rights and the evidence against them and adequate investigation of facts and legal issues. Ms. Deaner stated that an attorney should not recommend a guilty plea without thoroughly investigating the case. Ms. Deaner said that she could not recall how many investigators the public defender's office had at the time trial counsel represented the Petitioner but that they traditionally employed seven or eight investigators, which was insufficient to handle the caseload.

Ms. Deaner said that investigating the Petitioner's case ten years after the offense was committed would have been "difficult . . . but not impossible." She thought attempting to contact the witnesses should have been only the "tip of the iceberg" for the investigator and that he should have tracked down people who knew the witnesses and tried to find out what was going on in the lives of the victim and the victim's mother at the time of the offense. She further suggested that the investigator should have found the officers who took the reports the victim's mother made against the Petitioner to determine whether "there was some sort of personal animosity . . . in this relationship." She noted, however, that because trial counsel's case file did not have a written memo from an investigator, she did not know exactly what steps the investigator took.

Ms. Deaner stated that she had made the State and Davidson County aware of her office's significant lack of resources. She thought trial counsel would have followed up with the investigator if his schedule had permitted and that if trial counsel had been deficient in the Petitioner's case, his caseload was likely to blame.

Ms. Deaner said that in September 2014, her office began implementing a series of caseload controls to limit the number of clients the public defender's office would accept. Nevertheless, her office still had problems with its caseload.

On cross-examination, Ms. Deaner said that she did not know trial counsel's caseload at the time he was assigned the Petitioner's case and that she did not know how much time trial counsel spent on the case.

The post-conviction court found that trial counsel did not neglect his duty to investigate the case. The post-conviction court stated that the ten-year delay between the offense and the accusation could have substantially impaired the defense's ability to locate witnesses but that the delay was not attributable to trial counsel. The post-conviction court found that trial counsel used reasonable means, namely requesting the services of an investigator, to attempt to locate the witnesses. Accordingly, the post-conviction court found that trial counsel was not deficient as to that issue.

Further, the post-conviction court found that the Petitioner failed to establish prejudice. The court noted that trial counsel and the Petitioner had ongoing discussions about the plea agreement and that the Petitioner never stated he wanted to take the case to trial. Additionally, the post-conviction court observed that during the guilty plea hearing, the Petitioner said that he understood the charge to which he was pleading guilty, the sentence he was receiving, and the rights he was forfeiting by pleading guilty. The Petitioner also stated that trial counsel had explained the plea agreement and that he understood the agreement. Accordingly, the Petitioner knowingly and voluntarily entered his guilty plea. On appeal, the Petitioner challenges the post-conviction court's rulings.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the
> test, a failure to prove either deficiency or prejudice provides
> a sufficient basis to deny relief on the ineffective assistance
> claim. Indeed, a court need not address the components in
> any particular order or even address both if the [Petitioner]
> makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Further, in the context of a guilty plea, "the [P]etitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

On appeal, the Petitioner contends that trial counsel failed to conduct an adequate investigation due to the lack of resources in the public defender's office. The Petitioner concedes that, generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Citing Tavarus U. Williams v. State, No. 02C01-9711-CR-00423, 1998 WL 742348 (Tenn. Crim. App. at Jackson, Oct. 23, 1998), the Petitioner maintains that the "requirement that witnesses be made to testify at the post-conviction relief hearing when the Petitioner is claiming that counsel was ineffective for failing to investigate them is not without limitation."

In Tavarus U. Williams, the fifteen-year-old defendant was tried as an adult, convicted by a jury of first degree premeditated murder, and sentenced to life imprisonment after he shot and killed the victim outside of a bar in Memphis. Id. at *1. At the post-conviction hearing, the defense's investigator testified that she had located an unbiased witness who supported the defendant's claim of self-defense. Id. at *3. On the morning of the defendant's trial, the investigator put the witness's name and a summary of his testimony in trial counsel's "'box.'" Id. The witness was waiting outside the courtroom during trial; however, trial counsel did not call the witness. Id. At the post-conviction hearing, trial counsel testified that he had not known about the witness, and the investigator could no longer recall the witness's name. Id. On appeal, this court noted that we were "perplexed as to how the [defendant] *could* have produced [the] witness," stated that it was "fundamentally unfair to hold this failure of proof against the [defendant]," and held that "the Black rule [was] inapplicable under the facts of this case." Id. at *7.

The Petitioner argues that, as in Tavarus U. Williams, holding the Petitioner to the Black rule would be fundamentally unfair. The Petitioner explains that (1) the Petitioner's case involves an offense that occurred more than a decade ago; (2) the Petitioner is indigent and "has had to rely upon limited resourced indigent representation" throughout his case; (3) trial counsel could not locate the necessary witnesses "due to the greatly and arguably unconstitutionally limited resources afforded to his office"; (4) post-conviction counsel did not have access to "'staff investigators'" and was not "entitled to a court-appointed investigator due to this being a non-capital case on post-conviction"; and (5) "[a]s the concurrently filed Motion to Amend the Record reflects, [post-conviction counsel] subpoenaed [the victim's mother] to come to the post-conviction hearing on two separate court dates, but she refused to honor the subpoena."

However, the instant case is distinguishable from Tavarus U. Williams. The post-conviction court accredited trial counsel's testimony that he asked a defense investigator to locate and interview the victim, the victim's mother, and the victim's grandmother, but the investigator was unable to locate the witnesses. Trial counsel also stated that even if the investigator had located the witnesses, they may not have agreed to speak with him. The post-conviction court noted that "[w]ith a delay [in reporting] of more than ten years, . . . the ability to locate witnesses could have been substantially impaired. This delay was no fault of [trial counsel]. In attempting to locate witnesses through an investigator, [trial counsel] exercised reasonable means to investigate the case." Moreover, the Petitioner has failed to show that the witnesses could have been located and that they had information which would have been favorable to the Petitioner. Black, 794 S.W.2d at 757; Maurice Johnson v. State, No. E2017-00037-CCA-R3-PC, 2018 WL 784761, at *20 (Tenn. Crim. App. at Knoxville, Oct. 10, 2017). We conclude that the Petitioner failed to establish that trial counsel was ineffective.

On appeal, the Petitioner contends that the guilty plea was not knowing or voluntary because the trial court failed to ask if the Petitioner were satisfied with trial counsel or if he were "aware that he has a sixth amendment right to an investigation." However, at the guilty plea hearing, the Petitioner asserted that he understood the terms of his guilty plea and that he was entering his pleas freely and voluntarily.

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant

- 11 -

understands those consequences.  <u>Boykin</u>, 395 U.S. at 244.

In determining whether the Petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

<u>Blankenship v. State</u>, 858 S.W.2d 897, 904 (Tenn. 1993).  Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'"  <u>Dale Wayne Wilbanks v. State</u>, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977)).

The Petitioner does not allege that the trial court failed to give any of the warnings required by Tennessee Rule of Criminal Procedure (11)(b)(1) and (2).  The post-conviction court found that the Petitioner discussed the plea agreement with trial counsel and that he understood the terms of the plea agreement.  The post-conviction court found, therefore, that the Petitioner failed to establish that his guilty plea was not knowingly and voluntarily entered.  The record does not preponderate against this finding.

### III.  Conclusion

The judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE